**MILLIKEN RESEARCH
CORPORATION,
Appellant,**

v.

**DAN RIVER, INC., Appellee.**

**Appeal No. 83–727.**

United States Court of Appeals,
Federal Circuit.

July 5, 1984.

588

Tom Arnold, Houston, Tex., argued for appellant. With him on the brief was Jack C. Goldstein, Houston, Tex.

Roger W. Parkhurst and James A. Oliff, Alexandria, Va., of counsel.

Lewis T. Booker, Richmond, Va., and David Rabin, Greensboro, N.C., argued for appellee. With them on the brief were H.H. Huntley and L.A. Goodson, Jr., Danville, Va.

Before SMITH and NIES, Circuit Judges, and KELLAM, Senior District Judge.*

NIES, Circuit Judge.

This appeal is from the judgment of the United States District Court for the Western District of Virginia, Danville Division (Turk, C.J.), in a patent infringement suit brought by Milliken Research Corporation against Dan River, Inc. for infringement of Milliken's U.S. Patents Nos. 3,254,510 and 3,277,673, to Lesley. The district court held both patents (the Lesley patents) invalid for obviousness under 35 U.S.C. § 103. We *affirm*.

## I.

This litigation has been determinedly pursued and defended, virtually without surcease, since the filing of the complaint in 1970. We are advised that other cases are suspended pending its resolution. The case was assigned to a special master who attended depositions and held approximately six weeks of hearings during the period from November 1972 through May 1973. In a thorough and detailed report, dealing with numerous defenses, the special master concluded that, while the Lesley inventions were "narrow", the patents were valid and infringed. Particularly pertinent to our decision here is the special master's analysis therein of a prior art reference, U.S. Patent No. 3,069,885 issued to Cooper (Cooper '885), under which both parties to this appeal were licensed. Subsequently, the district court ordered reopening of the trial for consideration of additional evidence including a published article written by Alfred Reisfeld dealing with the state of the knitting art in early 1958. A supplementary report was filed by the special master, again concluding that the patents were valid. A third and final trial before the special master was conducted in October 1980, at which Dan River presented, *inter alia*, certain fabric samples and construction sheets of a third party, Celanese Corporation, (identified herein as Celanese 7182) as additional evidence of obviousness, if not a complete anticipation of the Lesley inventions. The special master again upheld the patents, finding that the Celanese fabrics were not proved to be prior art under 35 U.S.C. 102(b)[1] and also holding that the Celanese fabrics appeared to be "of a different structure", "in a different category" and to have been produced "by methods different from those of Lesley."

The case again came before Chief Judge Turk on Milliken's motion under Fed.R. Civ.P. 53(e)(2), for acceptance of each of the three master's reports, and Dan River's objections thereto. No additional evidence

* The Honorable Richard B. Kellam, *Senior District Judge*, Eastern District of Virginia, sitting by designation.

1. 35 U.S.C. § 102 provides:
   A person shall be entitled to a patent unless— ... (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States ....
   In this appeal the question is not whether the reference is an anticipation but whether it is within the scope and content of the prior art for purposes of determining obviousness under 35 U.S.C. § 103. *See In re Kaslow*, 707 F.2d 1366, 1374, 219 USPQ 1089, 1095 (Fed.Cir.1983).

was presented, but extensive argument and briefing was received by the court. It is readily apparent that Chief Judge Turk's decision was the result of a most careful and thorough, indeed exhaustive, study of the record and of the numerous legal issues advanced by the parties at that time. As far as this appeal is concerned, we need only address the court's conclusion that the Lesley inventions would have been obvious within the meaning of 35 U.S.C. § 103.[2]

In reaching its conclusion on obviousness, the district court relied on the findings of fact of the special master, denominating as "clearly erroneous" only the special master's conclusion that the evidence was insufficient to establish Celanese 7182 as prior art.

In accordance with the analysis required under *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966), the district court delineated the scope and content of the prior art, the differences between the prior art and the claims of the patents in suit and the level of skill in the art. Referring specifically to the teachings of Cooper '885, and the Reisfeld article, the court concluded that both the Lesley method and fabric claims failed to satisfy the statutory requirements of 35 U.S.C. § 103.

## II.

The patents in suit are directed to a method of fabricating knit fabrics ('673) and to warp knit pile fabrics ('510). Warp knit fabrics are produced on warp knitting machines by knitting together two or more sets (warps) of yarn. Lesley requires that the yarn of at least one of the two sets of yarn be "capable of substantial elongation", that is, be "elastic" and that the elastic yarn be knitted under greater "tension and extension" than the second yarn during the knitting operation. The claims refer to the required tension and extension as "stretching" or "stretched." Retraction of the elastic yarn causes very tight stitches in the resultant fabric base and forces the other yarn, of the other warp, away from the foundation to form a "raised pile" or "raised nap" effect. The Lesley method has the advantage of producing a raised nap or pile effect economically during knitting, without requiring post-knitting processes such as brushing or scouring of the fabric. The pile effect is on one side only and plates or covers the more elastic yarn.

The claims of Lesley '510 for the fabric itself read:

1. A warp knit fabric having a face side formed from stitches of a first yarn and a back side formed from stitches from a second yarn, said face side stitches being knit such that they contain a length of yarn at least 40% in excess of that required for a balanced fabric construction, said second yarn being capable of substantial elastic elonagtion [sic] and being uniformly closely knit and uniformly raising said face side stitches to form said face side stitches of loosely knit yarn to provide a uniform pile effect on one face of said fabric.

2. The structure of claim 1 wherein said first yarn is capable of elastic elongation.

The method claims 1–4 of the '673 patent specify:

1. The method of forming a raised pile surface knitting [sic] fabric with a knitting machine having two guide bars and a needle bar, comprising forming two loops from two yarns on each of a plurality of needles on said needle bar, one of said two yarns on each said needle being capable of substantial elastic elongation, stretching one loop formed of said one elastic yarn during loop formation on each of a plurality of needles

**2.** 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

while effecting substantially less stretch on the other said loop during loop formation, and permitting retraction of said substantially stretched loop after casting off thereof to thereby form a raised pile surface of said other loops, with the stretched and retracted yarn loops binding other said loops in place, and permitting the stretching during formation of each succeeding stretched loop to pull the preceding retracted said one loop tighter to thereby force the preceding adjacent said other loop further away from the foundation plane of the fabric as formed by said retracted loop.

2. The method according to claim 1 including maintaining the input tension of said one elastic yarn forming said one loop substantially above that of the yarn forming other said loop and substantially above the tension required for a balanced fabric construction.

3. The method according to claim 1 including permitting the feed of the other said yarn to form a loop thereof of a first size upon the completion of the loop-pulling portion of the needle stroke, while permitting the feed of said one elastic yarn to form a stretched loop thereof of size substantially equal to said first loop size but of substantially smaller effective loop size than said first loop size upon permissive retraction thereof after casting off.

4. The method of forming a knitted fabric having a raised nap surface, comprising successively pulling two yarns into loops on each of a plurality of needles and casting off said loops to form a knitted fabric, one of said yarns being elastically stretchable and being substantially stretched during loop formation while the other of said yarns is at a comparatively light tension and comparatively unstretched during loop formation, whereby the effective retracted length of such said one loop, after casting off, is substantially smaller than the effective length of each said other loop, to thereby yield an elastic foundation knit fabric having a raised nap surface formed of said other loops.

Unlike the claims to the fabric, the above claims do not specify any differential in the lengths of the two yarns, that is, a requirement for "40% overfeed."

Much of the argument of the parties below was directed to the meaning of claims. Chief Judge Turk found the claims considered alone ambiguous *in toto*. However, from reading the claims in conjunction with the specifications, he concluded, as had the master, that Lesley was claiming a pile on the lap side or technical back of the fabric despite the confusing reference to face side in the claims. We understand the back side of the fabric to be the side with arching floats or laps and it is these floats or laps which form the nap or pile.[3]

The court concluded: "When the patents are read as a whole, they disclose a warp knit fabric in which a lap side pile is formed as a result of knitting two warps in which the yarn fed from one warp through the back guide bars is more heavily tensioned or highly stretched than the other yarn." This was the construction asked for by Milliken, and it was on this interpretation that the court based its conclusion of obviousness. No contention has been made by either party on appeal that the court's construction of the claims is error.

---

3. Similarly, the drawings appear to disclose pile formed by the needle loops which would be on the face rather than laps on the back. Also claim 1 of '673 contains the words "to thereby form a raised pile surface of said other loops" which again leads one to expect the pile to be formed from the needle loops on the face. However, the specification states, "It is the laps of the stitches formed from the loosely tensioned warp that protrude ... to produce a raised nap or pile effect." Milliken defines "laps" as "floats which connect with the stitches and each extends from the base of one stitch in a given course to the base of another stitch in the subsequent course." A course is a horizontal row of stitches. The master found (56a): "Loop" is used to refer to a portion of yarn encircling a needle; it is also used to signify the *path* of an arch (as, for example, describing lap pile on the technical back of the fabric discussed by the patents in suit).

An issue not before us on appeal is whether the two Lesley patents in suit are entitled to the filing date of an earlier filed application (Lesley-1). Nevertheless, the prosecution history is significant in understanding the term "elastic" in the claims, which would otherwise be the source of further confusion. In Lesley-1, claiming fabric and method, Lesley suggested use of nylon, Dacron, or Orlon as the yarn capable of substantial elongation. These examples have greater elasticity than some yarns, such as cotton, but have minimal stretch capabilities as compared with others, such as spandex, which became available to Lesley after the Lesley-1 application was filed.

The references to "elastic" elongation came into the claims with the filing of Lesley-2 on May 11, 1962, denominated a continuation-in-part of Lesley-1 with claims to both fabric and method.[4] The fabric claims subsequently became the subject of a divisional application (Lesley-3).

In contrast to Lesley's use of nylon as an elastic yarn, the Cooper '885 patent, as discussed more fully later, suggests the use of nylon in a stretch fabric as a type of *inelastic* yarn. Thus, *elastic* in connection with *yarns* must be understood as a relative term. Further, Milliken uses the term "elastic" in connection with *fabric* as a synonym for a *stretch* fabric, which is yet another concept of elasticity. Despite nylon being identified as an elastic *yarn* in Lesley, Milliken does not assert that using nylon as the elastic *yarn* produces an elastic *fabric*. Indeed, the Lesley patents do not refer to producing an *elastic* or *stretch fabric*. On the other hand, when spandex is used in the Lesley method as the elastic yarn, an elastic or stretch *fabric* is produced.

The trial court concluded that the original patent application, Lesley-1, supported

the patents in suit and that "it would be expected that one skilled in the art would substitute the more elastic yarns for the nylon and other yarns disclosed in Lesley-1." The court also commented that the different characteristics of spandex and nylon tended "to support defendant's position ... that a fabric knitted with spandex is of a different character from one knitted completely of nylon or yarns of comparable elasticity."

## III.

Despite the years of litigation, the extensive trial period and voluminous record, as indicated, the issues have been reduced to a comparatively few before this court.

First, Milliken devotes a major portion of its briefs seeking to establish the proposition that a court of appeals directly reviews the reports of the special master, not the decision of the district court. Under Milliken's theory, this court would not only uphold the patent, but also the master's finding of infringement, on which the district court expressly did not rule.

Second, Milliken finds fundamental errors in the district court's "philosophical approach" to the obviousness issue which "colored" the district court's judgment.

Next, and more specifically, Milliken attacks (1) the district court findings with respect to what Cooper '885 discloses, particularly that a Cooper fabric exhibits a "pile", and (2) the court's finding that Celanese 7182 is prior art to Lesley.

Finally, Milliken attacks the district court's legal conclusion of obviousness, asserting that the references do not suggest "the combination of at least 40% overfeeding of the front bar yarns *and* a high degree of stretching of the back bar yarns"

---

**4.** References to "stretching", "retraction", and "binding" also came into the claims at that time. We have not analyzed the effect of the holding in the recent decision of this court in *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d 1423, 1437, 221 USPQ 97, 107 (Fed.Cir.1984) that acquiescence in the requirement for designation of an application as a *continuation-in-part* of an earlier application creates an estoppel to the patentee's argument that the continuation-in-part application contains no new matter. If the principle applies here, Lesley's on-sale fabric might well be prior art under § 102(b), and other references would be brought into the picture. Because of our disposition of this case, we need not address this problem.

in the absence of which "Mr. Lesley's patented inventions are not achievable."

Dan River essentially counters each of these arguments. In connection with obviousness, however, its argument is partly based on fabric sample exhibits of Burlington and Lesley which the district court specifically rejected as prior art. No assertion is made that the district court erred in those conclusions, nor is any type of explanation put forth as to why the exhibits should be considered by this court. Accordingly, these exhibits are not discussed herein.

## IV.

The issue of appellate review of a decision of a district court which rejects findings of a master before whom the case was tried is one of first impression in this court. Milliken would have us review the master's reports directly; Dan River would have us review the district court only. The parties agree that courts of appeals which have addressed this issue have espoused conflicting views. Milliken relies on decisions of the Second, Fifth, Sixth, Seventh, Eighth, Ninth and Tenth Circuits;[5] Dan River on the Fourth, Fifth and Eighth.[6] We conclude that the position of neither party correctly defines the role of this court.

Dan River asserts, "the District Judge was in as good position as the Master to extract findings from the wealth of material in the record. In such cases the district judge may evaluate the evidence independently and is free to reach a conclusion

contrary to that of the Special Master." In our view, this premise is erroneous.

The role of the district court vis-a-vis a master is set forth in Fed.R.Civ.P. 53(e)(2), which provides:

> *In Non-Jury Actions.* In an action to be tried without a jury the court *shall* accept the master's findings of fact *unless clearly erroneous.* Within 10 days after being served with notice of the filing of the report any party may serve written objections thereto upon the other parties. Application to the court for action upon the report and upon objections thereto shall be by motion and upon notice as prescribed in Rule 6(d). The court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions. (Emphasis added).

Dan River's position would eliminate the first sentence of Rule 53(e)(2) from our consideration in determining the propriety of the district court decision. In effect, Dan River argues that the district court conducts a trial *de novo* on the record. Clearly this is wrong, and it is not the role assumed by the district court in this case. Chief Judge Turk reviewed the master's findings as an appellate tribunal under the typical restraints imposed by the "clearly erroneous" rule.

Milliken, on the other hand, would have us wholly ignore the role of the district court in the appellate process. We cannot agree with this alternative position. We review the judgment of the district court

5. *Mergenthaler v. Dailey,* 136 F.2d 182 (2d Cir. 1943); *Morris Plan Industrial Bank v. Henderson,* 131 F.2d 975 (2d Cir.1942); *Rohde v. K.O. Steel Castings, Inc.,* 649 F.2d 317 (5th Cir.1981); *In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir. 1980); *Moore v. United States,* 412 F.2d 974 (5th Cir.1969); *Bazemore v. Stehling,* 396 F.2d 701 (5th Cir.1968); *Mt. Clemens Pottery Co. v. Anderson,* 149 F.2d 461 (6th Cir.1945), *modified sub nom., Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); *Ferroline Corp. v. General Aniline & Film Corp.,* 207 F.2d 912, 99 USPQ 240 (7th Cir.1953), *cert. denied,* 347 U.S. 953, 74 S.Ct. 678, 98 L.Ed. 1098 (1954); *Santa Cruz Oil Corp. v. Allbright-Nell Co.,* 115 F.2d 604, 48 USPQ 173 (7th Cir.1940); *O'Rieley v. Endicott-Johnson Corp.,* 297 F.2d 1

(8th Cir.1961) (Blackmun, J.); *Sanitary Farm Dairies, Inc. v. Gammel,* 195 F.2d 106 (8th Cir. 1952); *Lines v. Falstaff Brewing Co.,* 233 F.2d 927 (9th Cir.), *cert. denied,* 352 U.S. 893, 77 S.Ct. 129, 1 L.Ed.2d 88 (1956); *Potucek v. Lourdes,* 310 F.2d 527 (10th Cir.1962), *cert. denied,* 372 U.S. 930, 83 S.Ct. 875, 9 L.Ed.2d 734 (1963).

6. *United States v. Twin City Power Co.,* 248 F.2d 108 (4th Cir.1957), *cert. denied,* 356 U.S. 918, 78 S.Ct. 702, 2 L.Ed.2d 714 (1958); *O'Brien v. United States,* 392 F.2d 949 (5th Cir.1968); *United States v. 1,162.65 Acres of Land,* 498 F.2d 1298 (8th Cir.1974); *United States v. Hilliard,* 412 F.2d 174 (8th Cir.1969).

and its underlying findings and conclusions. In reviewing any factual findings adopted or made by the district court, we must comply with Rule 52(a).[7] However, the decision of the district court holding a finding of fact by the master clearly erroneous is not itself a "finding of fact", and our review of that decision is, thus, not controlled by Rule 52(a).

A decision by us that the district court erred in setting aside a finding of the master will necessarily make a contrary finding by the district court ineffectual. But it should be kept in mind that we are evaluating the district court's decision on an objection to the master's report, not the district court's substitute finding. Further, upholding the district court ruling that the master's finding was clearly erroneous does not *ipso facto* uphold a substitute finding by the district court. The latter is subject to review in accordance with Rule 52(a). In instances where the district court makes findings on the basis of additional evidence, the two step procedure is apparent, but the same type of analysis applies where the court simply resorts to an existing record.

■ Thus, we must first review, as a matter of law, the correctness of the district court's setting aside any factual finding by the master and, if that is upheld, review any substitute or additional findings of the district court under the "clearly erroneous" standard of Rule 52(a).[8] These principles will be utilized in assessing the conflicts between the district court and the master as they are dealt with later in the opinion.

## V.

■ With respect to Milliken's arguments that the district judge erred in his conclusion of obviousness because of errors in his philosophical approach, this can be answered simply. This court reviews judgments not opinions, as we have previously stated on numerous occasions. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540, 218 USPQ 871, 880 (Fed.Cir.1983); *In re Hyatt*, 708 F.2d 712, 715, 218 USPQ 195, 198 (Fed.Cir.1983). Thus, while Milliken is correct that this court has discarded the propositions that it is difficult to find "true inventiveness", i.e., non-obviousness, in a combination patent, *Environmental Designs v. Union Oil Co. of California*, 713 F.2d 693, 218 USPQ 865 (Fed.Cir.1984), and that if it was obvious to try combining elements, the combination itself must be obvious, *Jones v. Hardy*, 727 F.2d 1524, 220 USPQ 1021 (Fed.Cir.1984), Milliken must still convince us the district court reached a wrong result, which it has wholly failed to do. *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 220 USPQ 584 (Fed.Cir.1984).

Milliken also asserts that the district court plainly erred in failing to evaluate each claim of its patents separately. Milliken notes that while the district court correctly observed that "Lesley's inventions relate ... to the stretching of the back bar yarn," it failed to appreciate that the '510 fabric patent, as distinguished from the '673 process patent, is directed to a fabric having "the combination of not only a stretched back bar yarn but also *at least a 40% overfed front bar yarn*."[9]

■ While we agree with Milliken that claims must be evaluated separately, *Med-*

7. Fed.R.Civ.P. 52(a) provides, *inter alia:* Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial judge to judge of the credibility of the witnesses. The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court.

8. This review is similar to the analysis in *Ferroline v. General Aniline & Film Corp.*, 207 F.2d 912, 920, 99 USPQ 240 (7th Cir.1954); *United States v. Carroll*, 304 F.2d 300, 303 (4th Cir.

1962); and *United States v. Certain Interests in Property in Cumberland County*, 296 F.2d 264, 269 (4th Cir.1961).

9. This argument appeared to be abandoned at oral argument. Milliken there asserted that 40% overfeed was implicit in all claims, citing *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482–83 (1966). We do not decide this issue.

*tronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1582, 220 USPQ 97, 111 (Fed.Cir.1983), rather than as a single unit of claims tied together or "in tandem", Milliken has failed to show how the district court's treatment of the claims worked to its prejudice. Given the confusion as to what was claimed, Chief Judge Turk simply gave Milliken the benefit of all possible limitations in all claims, and, nevertheless, held the Lesley patents invalid.

Finally, Milliken asserts that the district court failed to understand that a product may infringe two valid patents simultaneously. In this case, Milliken asserts that the district court failed to appreciate that Dan River's accused fabric, which exhibits a pile, though licensed and made under the Cooper '885 patent, could still infringe the Lesley patents.

■ We, of course, agree with Milliken that a product may infringe more than one patent and that one may not be able to practice the invention protected by a patent directed to an improvement of another's patented article or method except with a license under the latter. However, we do not discern from Chief Judge Turk's analysis that he misconceived the law in this respect. Rather, he found support for his conclusion that the Lesley inventions would have been obvious from Cooper '885 (and other prior art) in the facts that the accused fabrics were licensed under Cooper '885, were made without knowledge of Lesley's patents, and showed a "pile."

## VI.

### A.

### The Prior Art

The most pertinent prior art as found by the district court is Cooper '885, a reference not considered during prosecution. The question whether Cooper '885, which was a pending application at the time Lesley-1 was filed, is prior art is no longer at issue.

Cooper '885 discloses the production of a warp knit stretch fabric consisting of a spandex foundation "plated", that is, covered, on both sides by a relatively inelastic yarn, such as nylon. Cooper was directed to utilizing spandex yarn in a manner which concealed certain undesirable characteristics of the bare spandex. Cooper accomplished his purposes by knitting spandex with comparative inelastic yarns with more desirable aesthetic qualities. The patent disclosure does not expressly discuss runner length ratios, overfeed, or pile.

The court made the following findings with respect to Cooper '885:

Cooper '885, as noted previously, discloses a warp-knit two-way stretch fabric consisting of an elastic yarn—spandex—plated between a technical back and front consisting of an inelastic yarn, such as cotton, nylon, or others similar. The patent, which resulted from Cooper's experimentation as documented in his notebook (D-33) represents an attempt—which has been very successful commercially—to utilize spandex yarns in a manner which conceals certain of their undesirable characteristics: they are clammy to the touch, and they tend to yellow with age. Plating accomplishes this design by insulating the spandex yarn from the wearer's touch, and by hiding the spandex behind yarns with more desirable aesthetic qualities. The yarns are knitted in opposite directions. The patent's example discloses nylon on the front warp in a 1–0, 1–2 pattern, and spandex on the back bar in a 1–2, 1–0 pattern. No runner ratios or tension differentials [25] are specified, although the specification provides that "the amount of compression in the finished fabric may be readily controlled by those skilled in the art." Col. 3, lines 73–75. The patent also discloses that "[a] balanced lapping movement is used with the two sets of guids [sic] bars making similar movements in opposite directions." Col. 3, lines 10–13. Finally, the specification provides:

In order to provide an acceptable fabric having a plated construction, i.e., with the yarns of the back guide bar

being covered by the yarns of the front guide bar on both the face and back of the fabric, the ratios of the original relaxed deniers of the elastic yarns to the inelastic yarns must be below about 4:1. At ratios above this limit, incomplete covering of the bare elastic yarns results. Denier ratios between about 4:1 and 1:6 are preferred. Col. 3, lines 33–40.

\* \* \* \* \* \*

Although Cooper does not inherently call for a high degree of stretch of the spandex yarn, it is obvious, from reading the patent, that such a degree of stretch is contemplated; otherwise, the desired plating effect would not be achieved. Further, the patent specifically allows for experimentation by the knitter to achieve the proper "amount of compression." Col. 3, lines 73–75.

Although plating, and not a pile surface, is called for, the pile is inherent in the plating process.

[25] It appears that the tension differential between the yarns in the accused fabrics is very slight, in absolute terms, whereas the Lesley patents call for a high tension differential. This is because spandex stretches a great deal at a relatively low (compared to nylon) tension. This makes it very uncertain whether the accused fabrics even infringe upon Lesley's claims. *See* note 31, *infra.*

The master made the following findings, which may add to understanding Cooper '885:

26. Beginning in 1958, Cooper engaged in experiments to develop a tricot warp knitted fabric which would have two-way stretch and would also not feel clammy to the wearer (clamminess being a non-desirable characteristic of Lycra [i.e. spandex]); and his solution was to sandwich the Lycra yarn between layers of a non-clammy yarn such as Nylon.

27. This was done by putting Nylon on the front bar and Lycra (or Fiber K as it was known in the experiments of Cooper) on the back bar of a warp knitting machine, or more specifically, a Tricot two-bar machine.

\* \* \* \* \* \*

30. Elastomer (or elastomeric) yarns [i.e. spandex] were becoming known in the trade in the early years of the 1960 decade.

31. The same tension on an elastomeric yarn and a Nylon yarn would stretch the former more than the latter.

\* \* \* \* \* \*

35. Cooper expected skilled knitters to make adjustments in denier, in knitting construction, and in knitting tensions to produce fabrics which would have the desired aesthetics, characteristics, and compression.

36. *Retraction or contraction of the spandex yarn brings the Nylon yarn to the surfaces of the fabric under the Cooper practice.* (Emphasis added.)

\* \* \* \* \* \*

7. The prior art referred to does not invalidate the putative inventions.

\* \* \* \* \* \*

h. The prior art defense is based principally on Lawson, Cooper, the Austrian Publication, two references considered by the Patent Office (Fletcher and Jennings), and also on the Lesley on-sale fabric. Taking these in order, they appear to be distinguishable from the development of the patents in suit:

\* \* \* \* \* \*

2) The *Cooper* patent is for a plated fabric, developed largely to assist in the commercial exploitation of duPont's elastomeric yarn (Fiber K) later given the name of Lycra [spandex]. The great advantage of Lycra is its elasticity, which it imparts to knitted fabrics; its drawbacks are its clammy feel and its tendency (later reduced) to become yellow. The principal object of Cooper and his associate was to cover the Lycra with Nylon (or some other suitable yarn), which would feel good to the wearer and which would not become yellow with age. *Even though Cooper himself realized that a pile of the covering yarn might be a greater*

*plating protection, since as the fabric was stretched the arched loops would be drawn down to the plane of the fabric, his patent does not call for a pile; and he himself denied that he had created a "true pile"* in the fabric a sample of which was attached to p. 41 of his notebook (Vol. VII, p. 94). In addition, the literature distributed by duPont to its licensees under the Cooper patent, while it discusses runner lengths, does not give any instructions for making a pile fabric. Cooper especially emphasizes the relative deniers of the yarns fed to the front and back bars, it being necessary for proper plating that the front bar yarn be of a sufficiently large denier, as compared with that of the back bar Lycra, so that the latter would be completely covered. He does not disclose the production of the lap pile or a lap pile fabric as specified by the patents in suit. [Second emphasis added.]

We discern no disagreement in the above quoted findings of the court and the master on the evidence or in what Cooper '885 discloses. The district court's finding that Cooper '885 inherently produces a pile does not *conflict* with the master's report and Milliken does not assert that it does. Rather, Milliken asserts that the district court finding that a pile is inherent in Cooper '885 is inconsistent with other statements in the district court opinion. Again we are faced with a confusing term—in this instance "pile".

To illustrate, the record discloses the following testimony with respect to whether Celanese 7182 exhibited a "pile." Dr. Brown, Milliken's expert, testified:

[T]he fabric itself upon examination does not show a pile at all let alone a uniformly closely knit pile.

    *       *       *       *       *       *

In my opinion if there is any elevation of the laps away from the back fabric it is so minimal that I would certainly not describe it as protruding from that surface.

Dan River's witness, Beard, on the other hand, testified:

Q. How can you tell by looking that it [Celanese 7182] is overfed?

A. Well, if you look at it like this and you turn it like I am turning it here and look at it, you can see the pile sticking up.

Q. And that is what, 7182?

A. Yes.

Q. I wonder if you might show the Judge [special master] just what you have done so that he will know. Would you please describe it to him so that he will know what you are doing?

A. What we are going to do is I am going to show you that there is more yarn in the back; this is not a tight stitch.

Now if you turn this over and you turn it like this, you can see how those little loops stick up; see that loop sticking up there?

THE SPECIAL MASTER: Yes.

THE WITNESS: Now if you stick a pin in there, it can go right through there and right up there easily.

THE SPECIAL MASTER: Yes.

Q. And that is on which side of the fabric?

A. This would be on the technical back.

Q. And is that a pile effect or a novelty fabric effect?

A. That would have been a pile effect.

Milliken provides the following definition for the "raised nap or pile effect" called for by its patent: "Raised, arching laps, protruding, and thus substantially spaced from, the closely knit foundation of a warp knit fabric."

We understand from the above that the extent to which an arching lap must protrude to be a pile is not a precise amount, particularly where the fabric is of such a close-knit construction that to the casual untrained observer, the fabric appears to be flat.

To add to the confusion in use of the term, Dan River asserts that a pile in a stretch fabric (e.g., made of spandex and nylon) is not the *permanent* pile called for by Lesley, but rather is a *transitory* pile. "Transitory" to Dan River means the pile exists when a *stretch fabric* is relaxed, but when the fabric is stretched, the laps forming the pile tend to flatten. Thus, Dan River asserts that the district court correctly said that a Cooper '885 fabric had a pile in this sense, even though Cooper did not "call for" a pile or did not intend to create a pile, or in Cooper's words was not a "true" pile. The pile simply is there, according to Dan River, because with the spandex in a related state the excess nylon must push up even without overfeed. Milliken, on the other hand argued, "The Lesley pile is precisely what the Dan River pile is. It's this kind of pile. It's always there when the fabric retracts again." Thus, we understand that in Milliken's view, Dan River's "transitory" pile is a "permanent" pile and the district court was simply wrong in saying pile was inherent in Cooper '885, which only calls for plating.

A final matter adding to the confusion: Milliken described Lesley's inventions as "plating" with a "pile".

The second reference discussed by Chief Judge Turk as prior art is an exhibit consisting of fabric swatches and instruction cards identified as Celanese 7182. Milliken contests reliance on Celanese 7182 as a prior art reference. Milliken also contends that, if Celanese 7182 is prior art, the disclosure is remote from Milliken's inventions. Milliken does not, however, dispute that Celanese 7182 teaches overfeed of the front bar yarn relative to the back bar yarn, albeit, in the amount of 25 percent rather than the 40 percent purportedly required to achieve Lesley's pile.

In connection with Celanese 7182, we are faced with conflicting determinations by the trial judge and the special master, although not to the extent indicated in Milliken's brief.

Milliken quotes extensively *but selectively* from finding 10 of the special master,

attributing to Celanese 7182 the specific details of construction described in the finding. Particularly, Milliken asserts the master found that Celanese 7182 does not exhibit a "pile." As presented in Milliken's brief, the master purportedly found with respect to Celanese 7182:

> 10. ... Brown testified generally and specifically that the ... Celanese yarns failed to comply with all the elements called for by the Lesley patents in suit. The fabric swatches ... were inspected *..., and it appeared to the undersigned that none of the fabrics approached the binding in place or the raised surface or uniform pile effect called for by Lesley; on the contrary, the fabrics appeared loose and the laps protruded or rose very little in any of the fabrics, less in some than in others.* The elements of Patent 3,254,510 in suit ('510) calling for one yarn to be uniformly closely knit and uniformly raising stitches of the other yarns to provide a uniform pile effect on one face of the fabric, read in the light of the specification of that patent, did not appear to be met by the fabrics that were inspected ... by the undersigned. [Emphasis added.]

The above quotation gives an inaccurate impression with respect to the finding by the master. The second and third sentences of the above quotation relate specifically to a Burlington fabric and other fabrics *inspected under a microscope.* That part of the sentences following the word "inspected" has been deleted. Moreover, in finding 15, the master specifically stated that finding 10 applied generally to the Celanese fabric except that he "had no recollection of viewing Celanese under a microscope." Our review of the record confirms that, at least during the trial, the master did not make a microscopic examination of Celanese 7182. Thus, with respect to the Celanese fabrics, the district court aptly adopted only the master's more general finding 20, which is as follows:

> 20. Considering the testimony as a whole and the appearance of the fabrics

as observed without magnification and the appearance of some under magnification, the Burlington and Celanese fabrics appear to be of a different structure and in a different category from the fabrics called for by Lesley Patent '510, and to have been produced by methods different, and in a different category, from those called for by the Lesley Patent '673, taking into consideration the elements of the claims of both patents read with (but not enlarged by) the specifications.

Thus, as far as the disclosure of Celanese 7182 is concerned, the master and the trial court had no disagreement. The district court accepted that the Celanese fabric, which was asserted as a complete anticipation, was different. Contrary to Milliken's assertion, the master did not make any findings with respect to the disclosure of Celanese 7182 not adopted by the district court. Milliken's elliptical presentation of the record was a serious disservice to this court.

The conflict between the district judge and the special master arises over whether Celanese 7182 should be considered at all. At the third trial, the master was presented with Celanese 7182 along with certain Burlington fabric exhibits and made the following pertinent findings of fact:

1. The Defendant introduced, as prior art and to show obviousness, experimental fabric samples (with construction sheets relating thereto) produced during the period from 1952 to 1958 by Burlington Industries, Inc., identified as numbers DX–285–291, inclusive; and two experimental fabric samples (with construction sheets) produced prior to 1954 by Celanese Corporation of America, identified as cards numbers 7165 and 7182, each contained in a book of Celanese fabrics with accompanying construction sheets, a copy of which book was furnished to a subsidiary of the Plaintiff and is identified as DX–298, and a copy of which was furnished to Burlington identified as DX–299.

\* \* \* \* \* \*

5. ... On cross-examination, Beard [an employee of Milliken subsidiary] testified that he had stated that it was impossible for him to say when he had received the Celanese cards (T., pp. 153–54)....

\* \* \* \* \* \*

11. The Celanese cards numbers 7165 ands 7182 contained fabric samples and construction sheets relating respectively thereto, which would enable a knitter to produce the fabrics.

\* \* \* \* \* \*

13. The Celanese fabrics were disclosed to Burlington and Milliken primarily to foster the sale of Celanese yarns. Although Celanese for a few years manufactured and sold fabrics, it was not established that the fabrics shown on cards 7165 and 7182 were on sale more than one year prior to April 6, 1959.

14. Both fabrics had overfeeding of the front bar, but neither as much as 40%, number 7182 having an overfeed of 25% and number 7165 of 7%.

\* \* \* \* \* \*

16. Beard testified that a pile could be seen on number 7182, and extracted from the fabric what he termed a loop. Taylor described number 7182 as slightly overfed on the front bar, said that there was a slight unbalance in the fabric with the back bar yarn fairly taut and the front bar slightly looser, with a very slight protrusion of the front bar yarn. He candidly described number 7165 as almost a balanced fabric, and for all practical purposes a balanced fabric. Brown, noting that neither fabric had as much as a 40% overfeed, testified that the overfeed of 25% in 7182 went into both the overlap and the underlap portions of the front bar stitches, that the fabric showed no pile, or so minimal a protrusion of the excess yarn that it could not be described as protruding, and otherwise placed both fabrics beyond the scope of the patents in suit.

17. Burlington and Celanese engaged in experimental work in the production of

various kinds of fabrics and the use of various types of yarn.

As a conclusion of law, the master held:

2. The evidence shows that there was some likelihood that some of the experimental fabrics were shown to customers or potential customers of Burlington and Celanese, at about the time that they were produced in the period from 1952 to 1958, but as a whole is insufficient to establish that *the fabrics were on sale* more than a year prior to April 6, 1959, when the Lesley application was filed. [Emphasis added.]

The district court adopted the master's findings and conclusion with respect to the Burlington fabrics. With respect to Celanese 7182, the court found error in the master's conclusion that the evidence was insufficient to demonstrate that Celanese 7182 had not been "on sale *or in public use.*" (Emphasis added.) The district judge then went on to hold that Celanese 7182 had been *"in public use."* Directly compared, it can be seen that the district court did not, in fact, overturn the master's findings and conclusion with respect to the asserted "on sale" bar. The district court relied on a different statutory ground, namely, "public use." However, since the court treated the master's findings and conclusion as effectively dealing with the "public use" defense as well, we will do the same.

The district court concluded that the master erred since it was "undisputed that the [Celanese] fabrics were furnished, in D–298 and D–299 [i.e., the Celanese notebooks], to third persons, and that no restrictions were put on their use." The court rejected the argument that such distribution could be for "experimental purposes" since the invention was out of the hands of the inventor and any testing was not "under his direction", citing *City of Elizabeth v. American Nicholson Pavement Co.,* 97 U.S. 126, 134, 24 L.Ed. 1000 (1877).

With respect to the date they were received, the district court said there was "no significant question about whether they were received by Celanese customers prior to 1959."

Milliken argues here that the master's finding was directed to the lack of evidence to establish the *date of receipt* by third parties. However, like the district court, we read the finding of the master more broadly. The master stated that there was only "some likelihood" that the "experimental" Celanese 7182 fabric was shown to Celanese customers. That the evidence was insufficient to prove third parties had been shown Celanese 7182 appears to us, as it did to the district court, to be the basis for the master's treatment of Celanese 7182 as "experimental" fabrics, and we agree with the district court that this finding was clearly erroneous. To view the record as a whole as establishing no more than "some likelihood" that these customers were shown Celanese 7182 ignores the fact that the exhibits were obtained from the customer's files. Thus, the district court's rejection of the theory that the Celanese fabrics were "experimental" in a legal sense cannot be faulted.

■ Turning to the district court's alternative findings, on which it based its conclusion that Celanese 7182 *was* in public use more than one year prior to the filing, Milliken bears the burden on appeal of establishing clear error. *Lear Siegler, Inc. v. Aeroquip Corp.,* 733 F.2d 881, 885, 221 USPQ 1025, 1030 (Fed.Cir.1984). We have no quarrel with the court's pragmatic evaluation of the evidence.

As an initial matter, from a reading of the testimony, the impression is gained that a pre-1959 date for Celanese 7182 was not seriously in dispute, as stated in the district court's opinion. Voluminous testimony was presented directed to whether the Celanese 7182 instructions were sufficiently detailed to be able to produce the fabric and to whether Celanese 7182 fabric showed a lap side pile. Indicative that the date was not a critical issue, for example, is the following exchange between counsel for Dan River and Milliken's witness Dr. Brown:

THE WITNESS: ... [T]he only difference I can see at all between these two sample cards [of Celanese fabrics] are the dates on them. One is dated May 25, 1954 and the other is dated June 22, 1954.

\* \* \* \* \* \*

Q. They are complete in all details [for making the fabric] as far as you are concerned?

A. I can't bring anything more to mind now that would be needed.

Q. As far as the date, I think we have already covered that.

A. As I said, the only difference is the date and that is the transmittal date of some kind.

While neither recipient of Celanese 7182 could recall the precise date on which it was received, this is not a fatal defect of proof. At the time of receipt, Celanese 7182 was no more than another sheet to be added to the Celanese notebook of the kind Celanese regularly sent out. There is no suggestion that the dates on the exhibits were altered or added later, or that the dates bear no relationship to reality or the date of manufacture. Thus, we do not find that the factual inference that the exhibits were "received prior to 1959," made by the district court from the evidence with respect to the Celanese notebooks, to be clearly erroneous. Celanese 7182, accordingly, will be considered on the issue of obviousness.

The principal remaining prior art is the Reisfeld article. Reisfeld wrote a series of articles, containing an extensive summary of the knitting art, which was published on February 24, 1958, more than a year before the first Lesley patent application. Reisfeld describes warp knit fabrics and discloses the production of long floats on the lap side by overfeeding the front bar. One example given by Reisfeld demonstrates a 12 percent overfeed; but Reisfeld does not confine himself to that percentage as a maximum. In more general terms, Reisfeld describes overfeeding one yarn of a two-yarn fabric and states:

> Thus, if on a two-bar fabric the runner of one bar is made *very long*, the laps of that bar will assume a form of *loose floats* or *even loops and protrude from the surface of the fabric.* This is sometimes made use of for obtaining novel texture fabrics or for production of towel cloths. The loose floats may even be napped to convert them into a deep pile. [Emphasis added.]

Reisfeld then describes creating the rough texture suitable for towelling by using cotton on both the front and back bar.

In another section of his article, Reisfeld discusses warp tension as a means for creating pattern effects although, admittedly, he made no attempt to discuss it in detail because of its complexity. He did state, however, the following:

> One beam threaded 6 in, 3 out is kept under normal tension, while the other, threaded 6 out, 3 in has its warp sheet maintained under a strong tension by heavy weights. As a result of tension differential the wales produced by the taut ends *stand up from the surface* of the fabric lending it a three dimensional effect....
>
> Its principle involves subjecting selected groups of warp threads to fluctuating tension in a manner where *one group of threads is made taut while the other slack.* [Emphasis added.]

## B.

### *The Differences between Lesley and Prior Art*

Based on the foregoing references, and others which were deemed cumulative, the master and the district court were in agreement that the differences between Lesley and the prior art were twofold: (1) feeding of at least 40 percent more yarn than conventional through the front guide bar than through the back bar,[10] and (2) substantial-

---

**10.** We note in passing that neither the master nor the trial judge made mention of the specific

statement of the Lesley '673 specification [Col. 4, line 8–10] that "less tension differential and

ly greater stretching of the elastic back bar yarn as compared with the stretching of the front bar yarn.

Apart from stretch and overfeed, the district court held that the "remaining disclosures [limitations] in the claims either simply describe warp knitting or describe effects which flow from the stretching differential." This is not disputed and, in any event, we agree.

## C.

### Level of Skill

With respect to level of skill in the art, there is also no dispute that, as found by the master:

> 63. The knowledge and skill of a skilled knitter are of a high caliber. He is able and expected to adapt and supplement general instructions in the construction sheet for a particular fabric in its manufacture.

## VII.

■ From the teachings of the prior art references, we agree with the district court that the Lesley inventions would have been obvious to one of ordinary skill in the art.

Stretching and retraction of one loop is the import of Cooper '885 which expressly teaches that the back bar yarn should be capable of substantial elastic elongation. Although Cooper does not specify a *high* degree of stretch of the spandex yarn, nevertheless, as the district court found, "a degree of stretch is contemplated; otherwise, the desired plating effect would not

be achieved." [*See also* special master's finding of fact 36: "Retraction or contraction of the spandex yarn brings the Nylon yarn to the surfaces of the fabric."] Whether Cooper '885 fabric does or does not exhibit a "pile" in its relaxed state is not the issue, and this court has not attempted to re-resolve a factual matter which Milliken tells us would require microscopic comparison of the exhibits and then be understood only with expert guidance. The method of knitting determines the effect achieved. Accordingly, we will look to the words of the references and to the arguments.

The necessity for stretching the back bar yarn, Milliken tells us, is that upon retraction, the elastic yarn loop will then create tight stitches which forces the arching lap portion in the stitch being made in the other yarn *away* from the foundation to form the *pile* effect. Cooper '885, thus, must also have tight stitches, as the district court found. Otherwise, the plate would not be brought to the surface, or, to paraphrase the above description, "*away* from the foundation to form the *plate* effect".

There is no question that several prior art references teach overfeed, not found in Cooper. Reisfeld, in particular, was relied on by Chief Judge Turk, and "other prior art references," presumably meaning Celanese 7182 which calls for overfeed of 25 percent.

Milliken argues before us, as quoted at the beginning of this opinion, that 40 percent overfeed is a significant minimum in

less excess yarn [i.e., overfeed] may be used if desired for a lesser degree of raised pile effect."

As noted, the district judge read all limitations into all claims. For completeness we will note some of the differences between the claims to show that, with respect to some claims, the differences from the prior art are minimal. In claim 1 of the method patent, a method of forming a raised pile surface depends entirely on stretching one loop while effecting substantially less stretch on the other loop, the stretched and retracted yarn loops binding said other loops in place. Claim 4 describes a method of making a *raised nap surface* and does not speak of binding loops in place, merely requiring that the retracted loop be substantially

smaller than the length of the other loop to form a raised *nap* surface. Milliken has not attempted to distinguish between a pile surface and a nap surface as indicated by the definition previously quoted. We understand a nap has less protrusion.

By way of contrast, claim 1 of the '510 fabric patent, requires at least 40 percent overfeed and a yarn *capable* of substantial elastic elongation—*no stretch* being specified. Claim 2 of the fabric patent allows both yarns to be capable of elastic elongation. However, the specification of the fabric patent does describe high tension and stretch on the back bar yarn in comparison to the front bar yarn [Col. 3, lines 9–24] as the way to form the uniform pile called for.

the Lesley invention. However, the district judge found the 40 percent cutoff point chosen by Lesley appears to be arbitrary, relying upon a fabric [D39] as support for Dan River's contention that nothing particularly unusual occurs when the overfeed is 40 percent. Moreover, the court noted, "According to Dr. Brown, Lesley must have 'thought that at 40 percent these fabrics were commercially acceptable fabrics and that at less than 30 percent they were not.'" Also, the court noted that Dr. Brown did not know what, if anything, unusual would occur at the 40 percent overfeed level. The court specifically rejected Dr. Brown's opinion that "the Reisfeld article and other prior art disclosing a lesser degree of overfeed teach away from Lesley by suggesting that higher degrees of overfeed are not possible."[11]

Milliken argues that the prior art does not suggest a combination of overfeed and stretch as in Lesley. As Milliken would have it, the combination would not have been obvious in the absence of an express suggestion in a prior art reference. This is clearly not the law. "The proper test is whether the references, taken as a whole, would suggest the invention to one of ordinary skill in the art." *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d at 1581–82, 220 USPQ at 110.

In any event, Milliken's argument must be premised on exclusion of consideration of Celanese 7182 which is a single reference which teaches one of skill in the art to combine overfeed of one yarn and greater tension on the other. In delineating the teachings of Celanese 7182, out of the voluminous record, the district court specifically noted the testimony of Milliken's own expert that the instructions of Celanese 7182 meant the back bar yarn would be knitted under greater tension than the front bar yarn. Thus, overfeed and different tensions are found in a single reference.

Milliken asks that we find legal error in the district court's conclusion on obviousness because the court said it was somewhat inconsistent for Milliken to suggest that the Cooper patent would not have made Lesley obvious and that Dan River's accused fabrics, though plated, would infringe Lesley because they have pile. We find in the trial judge's analysis only an appreciation that the breadth of the Lesley claims as asserted against the infringers makes Cooper '885 a much more pertinent reference than any considered by the Patent Office. Milliken rejects that the Lesley inventions are limited to the specific embodiments described in its patent applications, using nylon for the elastic yarn. Had that view been urged, the validity of Milliken's patents could well have been affirmed by the court below. However, with that reading of the patents, Milliken could not now reach the infringers, and this is what we discern from the trial judge's analysis.

The district judge accepted the clear responsibility on him to resolve the question of obviousness. With respect to that issue, he was in no way bound by the conclusion of the special master that Lesley had obtained valid, though narrow, patents.

The district court did not choose to discuss all references which would lend support to its conclusion on obviousness, nor to address all issues, recognizing the possibility that in a case of this magnitude, an issue of controlling importance, in the view of the parties, may have been omitted. The highly evident thoroughness of the court's attention to the case, however, makes the latter possibility unlikely.[1] The parties here mainly dispute the court's legal conclusion on the obviousness of the inventions. Based on the same art considered by the district court, we are led to the same conclusion that the claims of the Lesley patents would have been obvious within the meaning of 35 U.S.C. § 103.

---

**11.** The dissent's statement that there is "no evidence" to support the view that 40 percent is arbitrary is simply wrong. Also the dissent fails to note that the 40 percent limitation does not appear in the claims of the method patent. See n. 10, *supra.*

## VIII.

For the foregoing reasons, the decision of the district court holding U.S. Patents 3,254,510 and 3,277,673 invalid is *affirmed.* The parties shall bear their own costs.

AFFIRMED.

EDWARD S. SMITH, Circuit Judge, dissenting.

I respectfully dissent. I agree with the majority that the only significant issue in this appeal is whether the trial judge erred as a matter of law in concluding that the differences between the subject matter of the Lesley '673 and '510 patents and the prior art are such that the subject matter as a whole would have been obvious to one of ordinary skill in the art. I cannot agree, however, with the majority's conclusion with respect to obviousness.

The trial court apparently failed to apprehend either that infringement and validity are separate issues or that both the allegedly "blocking" Cooper '885 and Lesley patents could be infringed by Dan River. The majority attempts to sanction these errors. The trial judge relied on the fact that the alleged infringer, Dan River, was licensed under the prior art Cooper '885 patent as support for his conclusion of obviousness. Infringement and validity, however, are separate issues [1] that can and should be analyzed independently. I do not share either the trial court's or the majority's view of the inconsistency of Milliken's argument that Dan River could infringe both the prior art Cooper '885 plated fabric patent and the Lesley pile fabric patents in suit. Further, the trial judge's view, that Dan River could not infringe both the Cooper '885 and the Lesley claims, does not support his conclusion of obviousness.

The trial court also erred in applying greater scrutiny to a combination of old elements and in considering the claims in

tandem. Dan River has not established that these errors were harmless.

Also, the trial court apparently misunderstood the technology involved. In spite of expert testimony and the admissions of counsel at oral argument on appeal that microscopic viewing is essential in order to discern the detail of fabric construction, the district court declined to undertake such examination. I cannot join the majority in sanctioning that omission.

The above errors affected the trial court's reasoning and contributed to its erroneous conclusion that the Lesley patents are invalid under section 103.

The majority improperly casts aspersions on the Lesley claims as being vague. Only the section 103 issue, however, is before us; no issue of vagueness under section 112 is presented on appeal.

I agree with the majority that the district court's findings under *Graham v. John Deere Co.*[2] are not clearly erroneous. I disagree only with respect to the legal conclusion of obviousness in this regard. The special master gave thorough and careful consideration to the issue and did not err in concluding that the claims in issue are not invalid under section 103.

The Cooper '885 specification does not discuss either overfeed or pile. The Celanese 7182 fabric teaches overfeed of the front bar yarn, yet, only in the amount of 25 percent rather than the claimed minimum of 40 percent. While the majority is correct that Reisfeld does not confine himself to a maximum overfeed, the maximum overfeed actually disclosed by Reisfeld is only 12 percent, or half of the Celanese 7182 fabric overfeed.

The majority and the court below recognized the two major differences between the subject matter of the Lesley patents as a whole and the prior art: (1) minimum 40 percent front bar yarn overfeed and (2) substantial elongation of the elastic back

1. *Carman Indus., Inc. v. Wahl,* 724 F.2d 932, 937 n. 5, 220 USPQ 481, 485 n. 5 (Fed.Cir.1983); *Thomas & Betts Corp. v. Litton Syss., Inc.,* 720 F.2d 1572, 220 USPQ 1 (Fed.Cir.1983); *Medtron-* *ic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1582–83, 220 USPQ 97, 111 (Fed.Cir.1983).

2. *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459 (1966).

bar yarn. The majority fails, however, to note that the prior art does not teach or suggest either the claimed degree of overfeed or the claimed *high* degree of stretch on the elastic back bar yarn. While both overfeed and stretch are combined in the Celanese 7182 fabric, there is no suggestion of the claimed minimum *40 percent* overfeed or of *substantial* stretching of the back bar yarn in any prior art reference of record.

The majority's acceptance of the trial court's denegration as arbitrary of the 40 percent minimum overfeed limitation of the claims of the Lesley patents is not justified. The burden was on Dan River to establish such defect, if it exists. There is no evidence of record to support that view of the claimed 40 percent minimum overfeed limitation.

The court below erred in concluding that the Lesley claims would have been obvious under 35 U.S.C. § 103. I would reverse.