**ENVIRONMENTAL INSTRUMENTS, INC., Plaintiff,**

v.

**The SUTRON COMPANY, Defendant.**

**Civ. A. No. 87–577–A.**

United States District Court,
E.D. Virginia.
Alexandria Division.

May 19, 1988.

James H. Laughlin, Jr., Benoit, Smith & Laughlin, Arlington, Va., for plaintiff.

John S. Hale, J.W. Gipple, Gipple & Hale, McLean, Va., for defendant.

MEMORANDUM OPINION

ELLIS, District Judge.

### INTRODUCTION

Plaintiff, Environmental Instruments, Inc. (EII), brings suit alleging patent infringement by the defendant, Sutron Company (Sutron). Specifically, EII asserts that Sutron infringed upon EII's patent for a "Thermal Directional Fluid Flow Transducer," United States Patent No. 3,900,819

(hereinafter the '819 patent). Sutron responds that the '819 patent is void, and seeks to have it, as well as EII's patent for a "Directional Fluid Flow Transducer," United States Patent No. 3,995,481 (hereinafter the '481 patent), declared invalid. Moreover, Sutron asserts that EII committed fraud upon, and engaged in inequitable conduct before, the Patent Office in obtaining the '481 patent, and seeks treble damages and injunctive relief for unfair competition and antitrust violations.

The Court holds that the '819 patent is valid, but that there has been no infringement by Sutron. In addition, the Court holds that the '481 patent is invalid because the prior art rendered it obvious. Finally, the Court finds that EII did not commit fraud upon, or engage in inequitable conduct before, the Patent Office in obtaining '481 patent, nor did EII commit any acts constituting antitrust violations or unfair competition. This Memorandum Opinion records the Court's findings of fact and conclusions of law, pursuant to Rule 52, Fed.R.Civ.P.

As this suit arises under the patent laws of the United States, jurisdiction is properly premised on 28 U.S.C. § 1331 (Federal question), and 28 U.S.C. § 1338 (patents). Venue is appropriate under 28 U.S.C. § 1400(b).

## FINDINGS OF FACT[1]

### A. *The Parties*

EII is engaged in the design, manufacture and sale of directional wind-sensing equipment that has a variety of applications, including use in battle tank fire-control systems. Sutron is engaged in the design, manufacture and sale of environmental monitoring systems, and competes with EII for the sale of systems that employ directional wind sensing equipment. This case concerns two patents, the '819 patent and the '481 patent, both of which are relevant to the design and manufacture of wind-sensing equipment.

The named inventor of the inventions claimed in the '819 and '481 patents is Robert Djorup. In 1971, when the inventions were being developed, Djorup was associated with Environmental Instruments Group (EIG), a predecessor of EII. Djorup was a founder of EII in late 1971, and was EEI's technical director until he left the company in 1975. Djorup assigned to EII both his patent application number 330,400, which subsequently issued as the '819 patent, and his divisional application, which ultimately issued as the '481 patent.

Since 1977, Djorup has been an independent consultant and a licensor of hot film anemometry technology[2] to Cossonay, a Swiss competitor of EII.[3] Djorup has granted licenses to Cossonay under which Djorup receives income from sales of certain wind sensors alleged by EII to infringe Djorup's '819 patent.[4] It is uncontested that Sutron has purchased approximately sixty wind sensing probe heads from Cossonay. EII asserts that these probe heads contain sensing elements with a configuration that infringes Claim 1 of the '819 patent. In order to determine whether there has been any infringement, the Court must

---

1. These Findings of Fact were gleaned from the trial transcript. Citations to the trial transcript are indicated by the abbreviation "TR."

2. Hot film anemometry is, in very basic terms, the application of fluid flow mechanics to determine wind direction and velocity.

3. Djorup testified at the trial of this case on behalf of Sutron. Although Djorup is listed as the inventor on the '481 patent application, he testified that he had no knowledge of the claims asserted in the '481 patent and that the patent was invalid because its claims were anticipated in the prior art. Djorup did not testify about the validity of the '819 patent, except for stating that the patent is "inoperable" because of an "oversight at the time the claim was written."

Yet the Court finds that the '819 patent is operable as evidenced by its commercial success. Over 12,000 sensors employing the '819 patent have been sold.

4. Sutron solicited and was awarded a contract with the United States Air Force to supply 1,000 air monitoring systems using wind sensors. In its bid, Sutron specified that it would use EII sensors in performing under the contract. EII asserts that Sutron purchased an EII sensor and shipped it to Cossonay for comparison testing with a Cossonay sensor allegedly made in accordance with and infringing the '819 patent. This test purportedly revealed that the Cossonay sensor was superior to EII's. Sutron thus selected Cossonay to provide the wind sensors for the Air Force contract.

make findings regarding the scope and interpretation of the '819 patent claim as well as the design of the Cossonay probe heads. The Court must also make findings with respect to the validity of the '481 patent.

## B. *The '819 Patent*

The '819 patent was issued August 19, 1975, and covers a directional mass fluid sensor with electrical conductors separated from each other by an insulated bridge that prevents fluid flow around one conductor independent of the other conductor. The overall cross-sectional shape of the sensor is a figure eight:

The '819 patent contains only one claim.[5] This single claim was allowed only after extensive negotiations between Djorup and the Patent Office. The original '819 application contained fifty-five claims, none of which described the overall shape of the sensor as being a "figure eight" in cross-section.[6] The Patent Examiner, Elliot Goldberg, rejected all fifty-five original claims. Importantly, Claim 1 was rejected as being anticipated under 35 U.S.C. § 102 by the Hayakawa '085 patent.[7] The prosecution history[8] of the '819 patent establishes that Djorup then amended Claim 1 in

5. Claim 1, the only claim in the '819 patent, reads as follows:
(1) A directional fluid flow sensor comprising:
a. at least two similar thermally and physically separated resistive electrical conductors;
b. each of said conductors having a length at least equal to the largest cross section dimension of the conductor;
c. each of said electrical conductors including a hollow electrically nonconductive refractory cylindrical substrate supporting body extending the length of the conductor, and a conductive resistance film having a non-zero temperature coefficient adhered to the outer surface of the substrate body and extended over the length of the substrate body;
d. a thermo insulating bridging means operatively disposed between, and closing the gap between said electrical conductors over the length of the conductors, thereby preventing connected flow around one conductor independent of the other conductor, the overall shape of the sensor being figure eight in cross section, with the conductors being exposed to ventilation over at least a majority of their surface, and with the conductor pair cross section itself used to define the fluid dynamic cross section of a figure eight cross section which is exposed to the fluid stream where the resulting local stagnation region caused by impinging flow at its point of separation against an electrical conductor is therefore small with respect to the conductor cross section, each conductor exhibiting a change in electrical resistivity as a function of temperature; and,

e. each of said electrical conductors being provided with electrical connection means, whereby each electrical conductor can be electrically heated by an electrical current passing through each conductor.

6. See part (d) of Claim 1, *supra* note 5.

7. The Hayakawa patent, number 3,677,085, covers a wind sensor similar to the '819 patent and was the basic reference patent used by the patent examiner in evaluating the '819 patent. Many of the original claims of the '819 patent were rejected as anticipated by the Hayakawa '085 patent. After the original claims were rejected, Claim 1 of the '819 patent was amended so as to describe the overall cross-sectional shape of the sensor as a figure eight and thus distinguishable from the Hayakawa patent, which describes an ellipsoidal cross-sectional shape and conductors that are exposed to ventilation over a majority of their surface.

Kenneth Whitt, the president of Sutron, testified that Sutron purchased the rights to the Hayakawa patent after being advised by counsel that the Cossonay sensors most closely resembled that patent.

8. The prosecution history of a patent is the written record of the interactions between the inventor and the Patent Office from the time of the application to the date of issuance. The prosecution history is memorialized in the patent's "file wrapper," and may be important in defining the scope of a patent. *See Lam, Inc. v.*

order to escape the Hayakawa patent. Specifically, the amendments (i) defined the overall shape of the sensor as being a "figure eight" in cross-section, with the conductors being exposed to ventilation over at least a majority of their surface, and (ii) included additional structural limitations defining the sensor conductors as hollow, refractory cylindrical substrate supporting bodies extending the length of the conductor and on which is adhered a conductive resistance film having a non-zero temperature coefficient over the length of the substrate body. As amended, Claim 1 was the sole '819 claim ultimately allowed by the Patent Examiner.

The '819 patent application was filed on February 7, 1973. Prior to the filing of the application, however, Djorup was in contact with a number of companies interested in wind-sensing equipment for use in battle tanks.[9] For example, from approximately 1968 to 1972, Djorup attempted to develop for Hughes Aircraft Company a cross-wind probe for use in a tank fire-control system. Djorup collaborated in the development of this probe with SABCA, a Belgian licensee of the Hughes fire control system, which was designing a similar system for use in Belgian Army tanks. EIG, which later became EII, was under contract to both Hughes and SABCA to develop and supply the cross-wind probes.

Between 1968 and 1971 Djorup developed and supplied to both Hughes and SABCA experimental prototype "double bridge" probes.[10] These probes were not successful. In April or May of 1971, however, Djorup discovered that the double bridge probes could be improved and half the electronics eliminated by forming a single bridge probe. Djorup thereafter supplied to Hughes and SABCA, free of charge, experimental prototype single bridge probes for evaluation and testing. In early 1972, Djorup delivered to Hughes a prototype single bridge probe for evaluation. In February 1972, Hughes evaluated the probe and prepared to return it to Djorup. Ultimately Hughes chose not to return the probe, and instead sent a check, dated February 9, 1972, to pay for the probe.[11] Hughes then submitted a purchase order, dated May 3, 1972, to EII for eleven single bridge cross-wind sensors. With respect to SABCA, Djorup testified that a single bridge probe was sent "on consignment with no consideration" in August 1971.[12] Djorup first claimed that he put no restrictions on the use of the probe sent to SABCA, but subsequently testified that he told SABCA the probe would be the subject of a patent application and requested that SABCA "not openly disclose [the probe] to people who shouldn't know about it." (TR 235).

In addition to its dealings with Hughes and SABCA, EII had contacts regarding its cross-wind probes with Martin–Marietta Corporation, General Electric, the Frankfort Arsenal, which is a United States agency related to the U.S. Army tank program, and the British Embassy. None of these contacts is properly characterized as an offer for sale. Djorup testified that in November 1971 he provided a probe to Martin–Marietta similar to that described

---

*Johns–Manville Corp.,* 668 F.2d 462 (10th Cir.), *cert. denied,* 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982).

9. The timing and nature of Djorup's contacts with any company prior to the filing of the patent application play an important role in determining the patent's validity. If EII offered for sale any wind sensor, built in accordance with the '819 patent, more than one year prior to the filing of the patent application, then the patent is invalid. 35 U.S.C. § 102(b).

10. Djorup testified that the double bridge probes were developed between 1968 and 1969. The double bridge configuration is that of a cylindrical body used to support two sensing elements mounted parallel to the long dimension of the body and separated by approximately 90 degrees of the body's surface. Each element is operated independently by its own, separate bridge, hence the term "double bridge."

11. At trial, EII presented an invoice packing sheet, dated February 9, 1972, from Hughes to EII. This invoice makes reference to one cross-wind sensor received "for evaluation only on a consignment order" and indicates that the unit was to be returned to the vendor (EII). (TR 248–49). Djorup testified that Hughes decided to send a check for the unit rather than return it.

12. SABCA did pay, however, for all double bridge probes it received from Djorup and EII.

in the '819 patent for possible use in the Mars Landing Program. Yet Djorup testified that he gave the probe to Martin–Marietta for *testing*, and that "this was something that [EII] regarded as [its] property and that [Martin–Marietta] was to be careful in their disclosure of it to recognize [EII's] claim [of] ownership." (TR 241). With respect to General Electric, Djorup testified that he communicated with GE regarding the development of a wind-sensing probe for installation on a helicopter. On cross-examination, however, Djorup testified that his recollection was "hazy" and he could not remember which type of EEI probe was shipped to General Electric. Also, deposition testimony was introduced in which Djorup stated that although single element probes were shipped to GE, they were not of the type described in the '819 or '481 patents. Djorup also testified that in March 1970, he took a purchase order from the Frankfort Arsenal

for a single bridge probe unit. Yet Djorup had previously testified that the '819 invention was not even conceived until April or May of 1971, at least one year after the purported, undocumented proposal and sale to the Frankfort Arsenal. Finally, with respect to the British Embassy, Djorup testified that in 1971 he submitted price quotations for both double bridge and single bridge ('819) probes. The only documents introduced, however, show the delivery of two double bridge units to the British Embassy in 1970. Accordingly, the defendant has failed to prove an offer for sale by EEI of any probe covered by the '819 patent one year prior to the filing of the patent application.

### C. *The Sutron Sensors*

Close inspection of the Cossonay sensors sold by Sutron reveals that they have a "racetrack," or oval, configuration, depicted as follows: [13]

In addition, the RTV material that bonds the elements runs across the diameter of the circle of each conductor element so that the conductors are not exposed to ventilation over a majority of their surface. This is in sharp contrast to the elements in the '819 patent, which are almost entirely exposed.

### D. *The '481 Patent*

EII is also the owner of the '481 patent, issued December 7, 1976. The '481 patent was filed on August 11, 1975 as a division of the application that issued as the '819 patent. This patent covers an apparatus for measuring mass fluid flow comprising a dual element sensor connected to a Wheatstone bridge circuit [14] with the two sensor conductor elements of the sensor being electrically connected in series in a single arm of the bridge.[15]

13. Pierre Favre, the product manager for Cossonay, described the manufacture of Cossonay's probes. He testified that silicon resin is placed in the spacing between the two elements and then cut with a razor so that the sensor is elliptical, or oval in shape. Favre also testified that oval shape of the sensor is important to the sensor's function, for if too much resin is present different results are obtained.

14. This circuit, invented in the 19th Century, is capable of making precise measurements of electrical quantities and is used to compare im-

pedance elements by comparing voltages or currents associated with them.

15. Claims 1 and 2 are the only claims in the patent. Claim 1, the only independent claim, reads:
(1) Apparatus for measuring fluid flow comprising:
a. a dual element sensor having a pair of closely-spaced, elongate, temperature sensitive elements whose electrical resistance is a function of temperature, the pair of elements extending side by side along the sensor's longitu-

Although Djorup is listed as the inventor on the '481 patent application, he testified that the only claim he submitted was dependent upon the specific structure he claimed in the '819 patent, and this claim was not among one of the claims ultimately allowed. Djorup further testified that he did not write the claims set forth in the '481 patent, that they were written by someone else at EII after Djorup left the company, and that the '481 claims are invalid because they were rendered obvious by certain prior art publications. Included in these prior art publications are two proposals prepared by Djorup, *Proposal for Vehicle Attitude and Velocity Instrumentation,* NASA:SC# 8132, dated March 7, 1964, and *Copy No. 5 Vehicle Gust and Velocity Instrumentation,* dated March 23, 1964, which were submitted publicly, without restriction, to various United States agencies, as well as another Djorup publication, *Hot Cylinder Anemometer Operating Techniques,* dated April 7, 1969.[16] Djorup testified that these documents, which were not tendered to the Patent Office during the prosecution of either the '819 or '481 patent, relate to a probe delivered and sold to the FAA in 1964, and embody many of the same teachings as those set forth in the '481 patent. In addition, Djorup testified that another publication, written by Herman H. Lowell, *Design and Applications of Hot Wire Anemometers for Steady–State Measure-*

*ments at Transonic and Supersonic Airspeeds* (National Advisory Committee for Aeronautics 1950) [hereinafter the Lowell publication], teaches that the '481 claims were well-known in the prior art and therefore unpatentable. A detailed comparison of the teachings of these publications to the '481 claims reveals that the '481 patent was obvious and anticipated in the prior art and is therefore invalid.[17]

## CONCLUSIONS OF LAW

### A. *Validity of the '819 Patent*

Sutron attacks the validity of the '819 patent on four grounds: (1) the sensors employed in the '819 patent are inoperable, *see* 35 U.S.C. § 101; (2) the patent was invented jointly by Djorup and Roberge, but only Djorup is listed as the inventor therefore the patent is void, *see* 35 U.S.C. § 102; *Pointer v. Six Wheel Corp.,* 177 F.2d 153, 157 (9th Cir.), *cert. denied,* 339 U.S. 911, 70 S.Ct. 570, 94 L.Ed. 1338 (1949); (3) the '819 patent was anticipated or, alternatively, rendered obvious by the prior art, *see* 35 U.S.C. §§ 102(b) (anticipation), 103 (obviousness); and (4) the sensors employing the '819 patent were demonstrated and offered for sale more than one year before the filing date of the '819 patent application, *see* 35 U.S.C. § 102(b).

■ The Court holds that Sutron has not proven the '819 patent invalid. A patent is presumed valid, *see* 35 U.S.C. § 282, and to

---

dinal axis and having an electrically non-conductive thermal insulator disposed between the two elements which prevents fluid flow therebetween;
b. means connecting the two elements of the dual element sensor in series;
c. means connected to the dual element sensor and forming a bridge circuit with the two series connected elements of the sensor being in one arm of the bridge;
d. means causing a current to flow through the two series connected elements to cause them to be heated above the ambient temperature; and
e. regulating means connected to the bridge circuit for regulating the current to cause the total resistance of the series connected elements to be held constant for constant ambient temperature.
Claim 2 is a dependent claim which depends from Claim 1 and which reads:

(2) Apparatus according to Claim 1 for measuring fluid flow, further including:
f. a second sensor for sensing the ambient temperature, the second sensor having an element whose resistance is a function of temperature, the second sensor having its element connected in an arm of the bridge circuit separate from the arm having the elements of the dual element sensor, and the second sensor causing the regulating means to alter the regulated current to compensate for changes in the ambient temperature.

**16.** These publications were prepared by Djorup while he was employed by Basic Devices, Inc., prior to his employment with EII. Djorup testified that these prior publications were kept with his private papers and were not made available to anyone at EII (TR 323).

**17.** For a detailed comparison of the prior publications and the '481 claims, see Appendix "A."

overcome this presumption the moving party must demonstrate invalidity by clear and convincing proof. *See, e.g., Alco Standard Corp. v. TVA*, 808 F.2d 1490 (Fed.Cir.1986). Here, Sutron has not met this substantial burden. Each of Sutron's grounds for invalidation are separately addressed.

### 1. *Inoperability*

■ Robert Djorup, the named inventor of the '819 patent, testified at trial that the '819 patent is inoperable and therefore invalid. *See* 35 U.S.C. § 101. The Court finds that Djorup's testimony is not credible. Djorup battled the patent examiner over a two-year period in order to have the '819 patent issued. Yet he now comes into court, claiming that the '819 patent does not work based upon "an oversight at the time the claim was written" (TR 207). This unsupported assertion is contrary to common sense and to the other evidence presented. Moreover, Sutron has presented no evidence attacking the patent's operability other than Djorup's bald, self-serving assertions. In contrast, EII has presented evidence of the '819 patent's impressive commercial success. John Mincher, the president of EII, testified that over 12,000 devices employing sensors built in accordance with the '819 patent have been sold since 1975. This commercial success is compelling evidence that the '819 patent is operable. *See Flintkote Co. v. National Asbestos Manufacturing Co.*, 52 F.2d 719, 721 (3d Cir.1931) (commercial success strong evidence of utility); *cf. Entron of Maryland, Inc. v. Jerrold Electronics Corp.*, 295 F.2d 670 (4th Cir.1961) (commercial success evidence of unobviousness). Accordingly, the Court holds that defendant has not proven, by clear and convincing evidence, that the patent is inoperable.

### 2. *Misjoinder*

■ In order for a patent to be valid, the actual, original, and first inventor must make the application. *See* 35 U.S.C. § 102. Where there are joint inventors and only one is listed on the patent, the patent is void. *See, e.g., Pointer v. Six Wheel Corp.*, 177 F.2d 153, 157 (9th Cir.), *cert. denied*, 339 U.S. 911, 70 S.Ct. 570, 94 L.Ed. 1338 (1949). On this issue, Sutron has offered an affidavit of Robert C. Roberge, who began working with EIG in 1969 and was EII's General Manager from 1975 through 1986. Roberge alleged that he played a part in the conception and design of the cross-wind probe that was later patented by Djorup.[18] Yet Djorup, who appeared at trial on behalf of Sutron, testified that he was the inventor of the '819 patent and that he, presumably alone, conceived the idea of the double bridge probe in 1971. Djorup never mentioned any participation in this by Roberge. Also, Sutron made no attempt to elicit testimony from Djorup regarding the extent of any Roberge participation in the development of the '819 patent. Accordingly, the Court holds that Sutron has not proved misjoinder of inventors by evidence of a clear and convincing nature.[19]

### 3. *Anticipation and Obviousness*

■ "Anticipation," a patent law term of art, means disclosure in the prior art of something substantially identical to the claimed invention. Finding a patent "anticipated" by a disclosure in the prior art results in the invalidation of the patent. 35 U.S.C. § 102(b); *see, e.g., Smith v. Acme General Corp.*, 614 F.2d 1086, 1088 n. 6 (6th Cir.1980); *Titanium Metals Corp. v. Banner*, 778 F.2d 775 (Fed.Cir.1985). A patent claim is anticipated in the prior art "only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Brothers, Inc. v.*

---

**18.** This affidavit was submitted by Roberge, who is an owner of EII, in another suit involving EII and Djorup. At trial, this affidavit was offered by defendant and admitted without objection (see defendant's trial exhibit 6).

**19.** "[I]n order to show that an invention be truly called a joint invention, it must appear by clear and convincing proof that the two inventors collaborated in evolving the patented device. The two must have worked together for a common end, which was finally accomplished by the contributions and united efforts of both." *Pointer,* 117 F.2d at 157 (citations omitted).

*Union Oil Co.,* 814 F.2d 628, 631 (Fed.Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 95, 98 L.Ed.2d 56 (1987). Yet prior art which is insufficiently similar to support a claim of "anticipation," such as where all elements or their equivalents are not found in *one* patent but may be found in several different prior patents in the same art, may render a claimed patent "obvious" and therefore invalid. 35 U.S.C. § 103; *see Shanklin Corp. v. Springfield Photo Mount Co.,* 521 F.2d 609, 616–17 (1st Cir. 1975), *cert. denied,* 424 U.S. 914, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *see also Tights, Inc. v. Acme–McCrary Corp.,* 541 F.2d 1047, 1053 (4th Cir.) (obviousness test relevant in determining question of patentability), *cert. denied sub nom. Kayser–Roth Corp. v. Tights, Inc.,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). Here, Sutron asserts that the '819 patent was anticipated or, alternatively, rendered obvious by the teachings of the Hayakawa '085 patent and early double bridge cross-wind probes. This assertion is without merit. The Hayakawa patent was the dispositive reference patent used by the Patent Examiner who eventually allowed Claim 1 of the '819 patent. Sutron's assertion that the '819 patent was anticipated or rendered obvious by the Hayakawa patent directly contradicts the Patent Examiner's finding of validity, which is presumed correct.[20] 35 U.S.C. § 282. While the Patent Examiner's determination of validity is not unassailable, where, as here, the Patent Examiner used the alleged prior art patent as the basic reference patent, the party asserting invalidity must necessarily carry an especially heavy burden. Sutron has failed to carry this burden.

### 4. *Demonstration and Offer for Sale*

▮ A patent claim may also be invalidated by prior public use, demonstration, and offers for sale more than one year before the filing date of the patent application. 35 U.S.C. § 102(b); *see also J.A. LaPorte v. Norfolk Dredging Co.,* 787 F.2d 1577 (Fed.Cir.), *cert denied,* 479 U.S. 884, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); *Milliken Research Corp. v. Dan River, Inc.,* 641 F.Supp. 4 (W.D.Va.1982), *aff'd,* 739 F.2d 587 (Fed.Cir.1984). Here, Sutron asserts that EII offered to sell its probe to Hughes Aircraft, Martin–Marietta, SABCA, the Frankfort Arsenal, the British Embassy, and General Electric more than one year before the '819 patent application was filed on February 7, 1973. Yet, as set forth in the Findings of Fact, these contacts were not offers for sale. In the case of Hughes Aircraft, they were offers for experimental testing.[21] Experimental or developmental use of an invention does not constitute either a public use or a "sale" of the invention, even though compensation is received. *See, e.g., TP Laboratories, Inc. v. Professional Positioners,* 724 F.2d 965 (Fed.Cir.), *cert. denied,* 469 U.S. 826, 105 S.Ct. 108, 83 L.Ed.2d 51 (1984); *In re Yarn Processing Validity Litigation,* 498 F.2d 271, 278 (5th Cir.) ("patent is valid if the public use or sale was primarily for the purpose of experimentation"), *cert. denied sub nom. Sauquoit Fibers Co. v. Leesona Corp.,* 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed. 2d 654 (1974). In the case of SABCA, the probe was shipped on consignment without charge, and SABCA was asked not to disclose the probe, therefore no "offer for sale" took place. *See TP Laboratories,* 724 F.2d 965, 972 ("pledge of confidentiality is indicative of the inventor's continued control"). With respect to EII's dealings with Martin–Marietta, GE, the British Embassy, and the Frankfort Arsenal, the Court similarly concludes that no statutory offer for sale occurred.[22]

### B. *Infringement of the '819 Patent*

▮ A party asserting a patent right must prove infringement by a prepon-

---

**20.** Sutron correctly states that the Patent Examiner allowed clause "c" of Claim 1, which plaintiff has stipulated is in the public domain. Yet the prosecution history of the '819 patent does not reveal that clause "c" was essential to the Examiner's finding of validity. Rather, the prosecution history evidences Djorup's attempt to distinguish the '819 patent from the Hayakawa patent by defining the '819 patent's figure eight cross-sectional shape.

**21.** *See supra* note 11.

**22.** See Findings of Fact, *supra.*

derance of the evidence. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1361 (Fed.Cir.1983). A claim of literal infringement[23] requires a showing that "the accused device falls within the scope of the asserted claims as properly interpreted." *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758 (Fed.Cir.1984) (citation omitted). Here, EII has failed to prove literal infringement. The scope of the '819 patent, as established by its prosecution history, is very narrow, and the Court finds that the Cossonay device at issue is outside the scope of the '819 patent.

■■■ The first step in determining infringement is to construe the claims of the patents. *Moeller v. Ionetics, Inc.*, 794 F.2d 653, 656 (Fed.Cir.1986). A claim is construed in light of its language, the prior art, and its prosecution history. *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1118 (Fed.Cir.1985). Here, the prosecution history of the '819 patent establishes that its single claim was allowed only after the claim was amended so as to define the overall cross-sectional shape of the sensor as a figure eight.[24] The prosecution history thus requires that the '819 patent claim be narrowly construed. The shape of the allegedly infringing Cossonay sensor is elliptical, or oval in shape. There may be a slight "dip" or depression along the sides of the sensor, suggesting a "dumbell" rather than a racetrack configuration, but this configuration, too, does not infringe upon the '819 patent as properly construed.

■■■ Apart from its claim of literal infringement, EII asserts that the Cossonay sensor infringes the '819 patent under the "doctrine of equivalency." Under this equitable doctrine, infringement may be found in the absence of literal infringement where the accused device uses substantially the same means, in substantially the same way, to achieve substantially the

same results. *See, e.g., Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362 (Fed.Cir.1983). Although the doctrine of equivalency is designed to do equity, it is not designed to permit a patent to exceed the scope of its claims. *See Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–10, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950). Here, as discussed, the '819 patent must be narrowly construed in light of its prosecution history to encompass only the figure eight cross-sectional configuration. So construed, there is no equivalency. The Cossonay sensors at issue do not have a figure eight cross-section, but rather a racetrack, or oval configuration. Accordingly, the Court holds that the Cossonay sensor does not infringe upon the '819 patent.

### C. *Validity of the '481 Patent*

The Court holds that the '481 patent is invalid as being obvious in the prior art. 35 U.S.C. § 103. Sutron has proven, by clear and convincing evidence, that existing, published art at the time of issuance renders the patent's claims obvious.

■■■ In order to prove that a patent is invalid as obvious in the prior art, the moving party must show that the "difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103; *see Shackelton v. J. Kaufman Iron Works, Inc.*, 689 F.2d 334, 338 (2d Cir.1982), *cert. denied*, 460 U.S. 1062, 103 S.Ct. 1500, 75 L.Ed.2d 931 (1983). The determination whether a claimed invention is nonobvious and therefore patentable under 35 U.S.C. § 103 is a question of law, but it is necessarily based upon a factual inquiry into all of the evidence that bears on the question of nonob-

---

**23.** "Literal infringement" is distinguished from infringement under the "doctrine of equivalency." Although a device may not literally infringe a patent claim, the device may be so similar that it is substantially the equivalent of the infringed patent. *Compare Envirotech Corp.*

*v. Al George, Inc.*, 730 F.2d 753 (Fed.Cir.1984) (literal infringement) *with Hughes Aircraft Co. v. United States*, 717 F.2d 1351 (Fed.Cir.1983) (infringement per doctrine of equivalency).

**24.** *See* '819 patent Claim 1(d).

viousness. *Graham v. John Deere Co.,* 383 U.S. 1, 17, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *In re Sernaker,* 702 F.2d 989 (Fed.Cir.1983). In making these factual inquiries, the Court must consider the scope and extent of the prior art and the differences between the prior art and the claimed invention. *See Graham,* 383 U.S. at 17, 18, 86 S.Ct. at 693–94; *see also Simmons Fastener Corp. v. Illinois Tool Works, Inc.,* 739 F.2d 1573 (Fed.Cir.1984), *cert. denied,* 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985). Here, a close comparison of the '481 claims with the prior art publications of Djorup and Lowell demonstrates that the '481 patent was rendered obvious in the prior art and is therefore invalid.[25]

### D. *Inequitable Conduct*

■ Sutron, which bore the burden of proof, failed to show that EII engaged in inequitable conduct before the Patent Office in obtaining the '481 patent. Inequitable conduct by a patentee in procuring a patent from the Patent Office renders a patent unenforceable. *J.P. Stevens & Co. v. Lex Tex, Ltd.,* 747 F.2d 1553, 1560–61 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). In order to prevail on its claim of inequitable conduct, Sutron had to prove by clear and convincing evidence (i) an act of misrepresentation before the Patent Office, (ii) committed with the requisite intent,[26] (iii) involving material information, which (iv) was known or should have been known EII. *N.V. Akzo, Aramide Maatschappij v. E.I. duPont de Nemours & Co.,* 810 F.2d 1148, 1153 (Fed.Cir.1987). In applying this test, the elements of materiality and intent must be determined separately and then weighed together to ascertain whether the patentee engaged in inequitable conduct. The Court

"must then carefully balance the materiality and intent: the less material the proffered or withheld information, the greater degree of intent that must be proven. In contrast, a lesser degree of intent must be proven when the information has a high degree of materiality." *Akzo,* 810 F.2d at 1153.

■ Here, the prior art references in question, the Djorup and Lowell publications, are highly material.[27] But Sutron has failed to show, by clear and convincing evidence, any intent on the part of EII to defraud the patent office. Sutron has demonstrated that Djorup, who was the named inventor on the '481 patent, was aware of these prior art publications. Yet Djorup testified that he had no knowledge of the claims asserted in the '481 patent because these claims were submitted to the Patent Office after Djorup left EII. Sutron has failed to prove, by clear and convincing evidence, that anyone at EII (i) either had knowledge of the publications, or (ii) was negligent in failing to obtain knowledge of the prior publications. Indeed, Djorup testified that his prior publications were kept among his private papers between 1971 and the time he gave them to Sutron's attorneys because "they were [his] ..., [t]hey had nothing to do with EII." (TR 323). Accordingly, the Court holds that Sutron has failed to prove the requisite intent on the part of EII by clear and convincing evidence.

### E. *Antitrust Violations*

■ Sutron has failed to prove any antitrust violation by EII. In order to establish such a violation, Sutron must prove (i) a specific attempt by EII to monopolize the hot film anemometer market, and (ii) a dangerous probability that the attempt would be successful in achieving a monopo-

---

**25.** For a detailed comparison of the '481 claims and the prior art publications, see Appendix "A."

**26.** Gross negligence can be the intended level of intent when the misrepresentation has a high degree of materiality, but simple negligence or an error in judgment is never sufficient for a holding of inequitable conduct. *Akzo,* 810 F.2d at 1153 (citations omitted).

**27.** The test for determining materiality is whether there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent. Patent and Trademark Office, 37 C.F.R. § 1.56 (1987). Here, Sutron has proven by clear and convincing evidence that the Djorup and Lowell prior art publications are "material." *See* Appendix "A."

ly in the relevant market. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 875 (Fed.Cir.1985). Here, Sutron asserts that EII obtained the '481 patent by committing fraud upon the Patent Office and thereafter used the patent to exclude parties from the relevant market through threats of lawsuits. *See, e.g., Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). However, as previously discussed, Sutron has failed to establish that EII engaged in inequitable conduct in obtaining the '481 patent. Proof of fraud must meet an even higher standard; it requires clear and convincing evidence of an *intentional* misrepresentation or *intentional* withholding of a material fact from the Patent Office.[28] *See, e.g., Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed.Cir. 1983). Sutron has failed to meet its burden of proof. Accordingly, the Court holds that EII has committed no antitrust violation.

### F. *Unfair Competition*

 Sutron's assertion that EII engaged in unfair competition in bringing its '481 infringement suit is without merit.[29] EII's infringement suit is entitled to a presumption of good faith, and Sutron bears the burden of proving by clear and convincing evidence that EII brought its suit in bad faith. *Loctite Corp. v. Ultraseal, Ltd.*, 781 F.2d 861 (Fed.Cir.1985). The basis for Sutron's claim is that John Michner, the president of EII, was present at a previous trial involving Djorup in which Djorup alleged, under oath, that the '481 patent was invalid.[30] Sutron, however, has presented no evidence that the validity of the '481 patent was ever reached in the previous litigation. Accordingly, the Court holds that Sutron has failed to meet its burden of proving by clear and convincing evidence that EII brought its '481 infringement claim in bad faith.

## CONCLUSION

The Court concludes (i) that the '819 patent is valid, but that there has been no infringement by Sutron, and (ii) that the '481 patent is invalid as rendered obvious in the prior art. Moreover, the Court finds that EII did not commit fraud upon, or engage in inequitable before, the Patent Office, nor did EII commit any acts constituting antitrust violations or unfair competition. Accordingly, judgment is awarded (i) in favor of defendant Sutron on the Complaint and on Count I of Sutron's Counterclaim insofar as the '481 patent is declared invalid, and (ii) in favor of plaintiff EII on the remaining counts of Sutron's Counterclaim. The parties are to bear their own costs.

## APPENDIX A

I. Comparison of claims 1 and 2 of the '481 patent with the prior art publications

| '481 Djorup Claims | Djorup Publications |
| --- | --- |
| 1. Apparatus for measuring fluid flow comprising: | See probe on page B–1 (top), see circuit on page B–2.[1] |
| a. a dual element sensor having a pair of closely spaced, elongate, | Probe on page B–1 shows two elongated film elements close to each other at top of wedge. |
| temperature sensitive elements whose electrical resistance is a function of tempera- | Probe shows platinum film elements; platinum film elements are temperature sensi- |

---

**28.** In certain circumstances, gross negligence, as opposed to an intentional misrepresentation or omission, may be sufficient for a holding of inequitable conduct. *See supra* note 26.

**29.** EII dropped its '481 infringement claim prior to trial.

**30.** Djorup's allegations are not surprising as he had adverse interests to EII in the previous litigation.

| '481 Djorup Claims | Djorup Publications |
|---|---|
| ture, | tive and change electrical resistance as a function of temperature. |
| the pair of elements extending side by side along the sensor's longitudinal axis and having an electrically non-conductive thermal insulator disposed between the two elements which prevents fluid flow therebetween, | See probe on page B–1; both films are in parallel along the edge of wedge which is thermally insulative Mullite supported between two elements preventing fluid flow. |
| b. means connecting the two elements of the dual element sensor in series, | See circuitry diagram, page B–2, which shows lead wires for electrical connection to both elements which are connected in series. (first R subfilm connected in series with second R subfilm). |
| c. means connected to the dual element sensor and forming a bridge circuit with the two series connected elements of the sensor being in one arm of the bridge, | See circuitry diagram, page B–2. Both series connected films are in one bridge arm E with R1, R2 and R3 completing the 4 arm bridge. |
| d. means for causing a current to flow through the two series connected elements to cause them to be heated above the ambient temperature, and | See circuitry diagram, page B–2. Amplifier across bridge followed by current amplifier used to supply heating current to bridge which passes through R1 and both series R films. Current shown as I plus delta I. |
| e. regulating means connected to the bridge circuit for regulating the current to cause the total resistance of the series connected elements to be held constant for constant ambient temperature. | See circuitry diagram, page B–2. Amplifier amplifies bridge error signal E sub r and current controller feeds back heating current to bridge in closed feedback loop causing automatic control of constant temperature element operation for constant ambient temperatures. |
| 2. Apparatus according to claim 1 for measuring fluid flow, further including | Another Djorup publication,—*Hot Cylinder Anemometer Operating Technique,* [hereinafter *Hot Cylinder* publication] dated April 7, 1969, shows a figure with temperature sensitive referenced resistor, used in measuring fluid flow. |
| f. a second sensor for sensing the ambient temperature, the second sensor having an element whose resistance is a function of temperature | Djorup's *Hot Cylinder* publication describes a "temperature sensitive reference resistor." |
| the second sensor having its element connected in an arm of the bridge circuit separate from the arm having the elements of the dual element sensor, | Djorup's *Hot Cylinder* publication shows a sensor diagram where one sensing arm element arm is separate from another arm containing a temperature sensor. |
| and the second sensor causing the regulating means to alter the regulated current to compensate for changes in the ambient temperature. | *Hot Cylinder* publication describes how resistance can be varied to set the overheat operation level of sensor 1. The resistor senses temperature difference between sensor and ambient temperature. |

[1] Both the probe diagram, appearing on page B–1, and the circuit diagram, appearing on page B–2, were set forth and explained in Djorup's *Proposal for Vehicle Attitude and Velocity Instrumentation* and *Copy No. 5 Vehicle Gust and Velocity Instrumentation* publications.

II. Comparison of claim 1 of the '481 patent with the Lowell prior art publication:

| '481 Claim | Lowell Publication |
| --- | --- |
| 1. Apparatus for measuring fluid flow comprising: | |
| a. a dual element sensor having a pair of closely spaced, elongate, | Describes a "v" array of two long lines. |
| temperature sensitive elements whose electrical resistance is a function of temperature, | Describes the variation of wire resistance with temperature. |
| the pair of elements extending side by side along the sensor's longitudinal axis and having an electrically non-conductive thermal insulator disposed between the two elements which prevents fluid flow therebetween, | Describes a "v" array. |
| b. means connecting the two elements of the dual element sensor in series, | States that "a V-array may be used as a single wire by placing the two wires in series." |
| c. means connected to the dual element sensor and forming a bridge circuit with the two series connected elements of the sensor being in one arm of the bridge, | States that "the pair comprise one arm of a bridge." |
| d. means for causing a current to flow through the two series connected elements to cause them to be heated above the ambient temperature and | |
| e. regulating means connected to the bridge circuit for regulating the current to cause the total resistance of the series connected elements to be held constant for constant ambient temperature. | Lowell measures rather than controls. |

Platinum Film .2 x 1.5 m.m.

Leadwires

3 mm dia. Mullite

30° Wedge 7½°

Wedges Rotated 90° To each other

Film either side of wedge

YAW

Stainless Steel

<1 cm. dia. Mullite (30° Cone)

pitch

Appx. 6 Times Size

Airstream

**PROBE CONFIGURATION**

(SHOWING SINGLE WEDGES)

Double Wedges Use Four Support Rods 3MM in Diameter

B-1 BASIC DEVICES INC.

Power Input → REGULATED POWER SUPPLY

To Identical Perpendicular Axis

DIFFERENCE AMPLIFIER → CURRENT CONTROLLER

Heating Current

$R_1$

$R_2$

Longitudinal Velocity Signal

$E_r$

$R_{film}$

AIRSTREAM $U + \Delta U$

$I + \Delta I$

$R_4$

$R(balance)$

$E$

$R_5$

$R_3$

$R_{film}$

NULL DETECTOR

Output

DOUBLE FILM CONTROLLED BRIDGE BLOCK DIAGRAM

B-2